Dayis, J.,
delivered the opinion of the court:
The substantial question, one now first presented for our consideration, is whether a Chickasaw freedman, who is alleged to have suffered from Indian depredations in the years 1867, 1870, and 1871, was then a citizen of the United States, and thus entitled to the benefit of the statute colloquially called the Indian depredation act.
This act (March 3,1891, 26 Stat. L., p. 861) authorizes the Court of Claims to adjudicate claims “ for property of citizens of the United States taken or destroyed by Indians ” in amity with the defendants subject to certain limitations, not now important.
The parties to the litigation are clearly defined in the statute: on the one hand,' citizens of the United States; on the other *442 band, Indians; but, only those Indians who were in amity at the date of the incident from which the claim arises. This plaintiff, to give the court jurisdiction, must show that at the date of the alleged loss he was a citizen of the United States.
Jackson is the child of parents of African race who at the time of his birth were slaves of the Ohickasaws, residing in the Indian Territory. He was held as a slave by a Chickasaw Indian prior to 1866.
July 28,1866, a treaty between the defendants herein and the Chickasaw Indians was proclaimed by the President, containing substantially these provisions:
The Indians abolished slavery; they, for a specified consideration, ceded land to the defendants and agreed to grant rights to all persons of African descent residing in the said nations ” at a certain-date; the money to be paid by defendants to the Choctaw and Chickasaw nations was subject to a deduction for “suck persons of African descent” as, within a period named, should remove from the nations. Defendants further agreed under certain contingencies to “remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed from said nations to have no benefit” from the moneys paid to the Indians by defendants.
The treaty further contains an agreement (art. 4) by the Indians “ that all negroes, not otherwise disqualified or disabled, shall be competent witnesses in all civil or criminal suits and proceedings” in the Indian courts, and that the negroes’ labor contracts shall be protected.
There were further general provisions for the freedmen remaining in the Indians’ country not necessary here to recite. (14 Stat. L., p. 769.)
In substance, then, the Chickasaw slaves were emancipated; the Indians surrendered lands and were paid for them; this payment was conditional; the freedmen within the nation in 1865 were to be admitted to Indian citizenship or the money due from defendants for the land ceded was to be retained for the benefit of such freedmen as should prefer to leave the Chickasaw Territory, the United States being charged with the duty of removing these freedmen from the- Chickasaw Territory within a specified time after the expiration of the *443 period allowed tbe Indians to decide whether they would receive these negroes as citizens of their nation.
The Choctaws and Chickasaws were associated in the various negotiations relating to this subject-matter, and in 1882 the Choctaws, complying with the conditions imposed by the Congress, received their balance of the money promised by the treaty. The Chickasaws [see act of their legislature dated November 9,1866] declined to adopt the freedmen and indicated a desire to make a financial sacrifice provided the negroes should be removed from the nation’s territory by defendants.
No early affirmative action on the part of the parties to the contention is shown us, and the condition apparently continued until January 10, 1873, when the Chickasaw legislature passed this act “To adopt the negroes of the Chickasaw. Nation.” (Ex. Doe. 207, Forty-second Congress, third session.)
“ AIN ACT to adopt the negroes of tlie Chickasaw Nation, etc.
“Section 1. Be it enacted by the legislature of the Chickasaw Nation, That all the negroes belonging to Chickasaws at the time of the adoption of the treaty of Fort Smith, and living in the Chickasaw Nation at the date thereof, and their descendants, are hereby declared to be adopted in conformity with the "third article of the treaty of 1866, between the Choctaws, Chickasaws, and the United States: Provided, however, That the proportional part of the three hundred thousand dollars, specified in article third of the said treaty, with the accrued iuterest thereou, shall be x>aid to the Chickasaw Nation for its sole use and benefit: And provided further, The said adopted negroes of the Chickasaw Nation shall not participate in any part of the said proportional part of the said three hundred thousand dollars, nor be entitled to any benefit from the principal and interest on our invested funds or claims arising therefrom, nor to any part of our common domain, or the profits arising therefrom (except the forty acres per capita provided for in the third article of the treaty of eighteen hundred and sixty-six), nor to any privileges or rights not authorized by treaty stipulations: And provided further, That the said adopted negroes, upon the approval of this act, shall be subject to the jurisdiction and laws of the Chickasaw Nation, and to trial and punishment for offenses against them in every case just as if the said negroes were Chickasaws.
“Sec. 2. And be it farther enacted, That this act shall be in full force and effect from and after its approval by the proper authority of the United States; and all laws, or parts of laws, in conflict with this act are hereby repealed.”
*444 No action in relation to tbe matter was taken by tbe Congress of tbe United States until 1894 (28 Stat. L., 836), when tbis statute was enacted:
“Sec. 18. That tbe approval of Congress is hereby given to An act to adopt tbe negroes of the Chickasaw Nation,’and so forth, passed by tbe legislature of tbe Chickasaw Nation and approved by tbe governor thereof January tenth, eighteen hundred and seventy-three, particularly set forth in a letter from the Secretary of the Interior transmitting to Congress a copy of the aforesaid act, contained in House Executive Document Numbered Two hundred and seven, Forty-second Congress, third session.” '
There was delay in all this and neglect to take advantage of technicalities; not impossibly because delay was thought to be wise and helpful under the most peculiar circumstances existing in the Indian Territory after the practical close of the war in 1865. Be this at it may, one point is fixed, that in 1894 by act of the Chickasaw legislature, approved by defendants’ Congress, the freedmen became “subject to the jurisdiction and laws of the Chickasaw Nation and to trial and punishment for offenses against them in every case as if the said negroes were Ohickasaws.”
The first of the alleged depredations occurred in 1867, and the political status of this plaintiff upon that date is to be determined. By the treaty of 1866 he became a “Freedman;” but did he therefore become a “citizen of the United States?”
The proclamation of emancipation by its terms was limited to certain districts; the Indian Territory not included. This proclamation did not affect plaintiff’s legal relation to the Government.
The thirteenth amendment to the Constitution was adopted December, 1865, and declared that “ neither slavery nor involuntary servitude * * * shall exist within the United States or any place subject to their jurisdiction.”
It is urged with force that this amendment did not abolish slavery within the Indian tribes, as these slaves were not “ subject to the jurisdiction” of the United States, but were subject to the jurisdiction of a semi-independent nation, with which the United States negotiated through treaty, and to which their statute law or judicial jurisdiction and control was not extended.
*445 At the time of this amendment to tbe Constitution commissioners were negotiating a treaty with defendant Indians, designed to free their slaves, and various other treaties were negotiated with other Indian tribes in furtherance of the national policy of abolishing slavery. (Dwamisli tribe, 12 Stat. L., 927; Skallams, id., p.935; Makahs, id., p. 941; Seminóles, 14 Stat. L., 755; Creeks, id., 785; Cherokees, id., 799.)
Plaintiff was born within the territorial jurisdiction of the United States; also within another subsidiary semi-independent jurisdiction. He was born a slave within a nation whose members were not citizens of the United States and did not become citizens; a nation which was recognized in many political respects as independent. Plaintiff’s master was not born a citizen, and did not .become a citizen. Could the slave so born within that territory and within the control of the master’s tribe, without action affirmative on his part, and while remaining with his former master, become a citizen of the United States when the master could not? The Indian, the master, owed primary allegiance to his own tribal form of government, and this allegiance has been steadily recognized by the United States Government, which has, until within but few years, dealt with the Indian tribes by treaty and not by statute.
The less is included within the greater, and the slave remaining with the master in the Indian Territory within tribal jurisdiction does not achieve citizenship in the United States by emancipation alone.
While the Fourteenth amendment to the Constitution was under consideration, the treaty of 1866 was negotiated. This permitted the Chickasaws to retain the freedmen within tho tribe as members of the tribe or not to do so. No such course could have been pursued were the freedmen citizens of the United States. Further, in 1894, Congress, ratifying the action of the Chickasaws, recognized these freedmen as Chickasaws.
We nowhere find the freedmen recognized in treaty or in statute as citizens of the United States. In questions of this nature the course of the political department of the Government is to be received by the courts with very high respect.
We conclude that this plaintiff was at the date of the alleged depredation what he is in fact and what he has been colloquially termed, a “ Chickasaw freedman,” entitled to the rights *446 of tbe legally recognized class to which, he belongs, and that he was not at that date a citizen of the United States.
Petition dismissed.